United States Court of Appeals,

Fifth Circuit.

No. 95-10877.

James E. WEIR, Individually and as Representatives of a Class of all Former Employees of the Dallas Office of the Federal Asset Disposition Association ("FADA"); William Ferguson, Individually and as Representatives of a Class of all Former Employees of the Dallas Office of the Federal Asset Disposition Association ("FADA"); Pamela Bender, Individually and as Representatives of a Class of all Former Employees of the Dallas Office of the Federal Asset Disposition Association ("FADA"); Shirley Albright; Eleanor M. Bates; Melinda Benton; John B. Bills; Brenda S. Blume; Fred A. Brown; Mozella L. Brown; William P. Clements; Edgar Allen Cruthirds; Ronda R. Decker; Valerie M. Farmer; Karen S. Fitzgerald; Jackie L. Flannagan; Toi B. Forswall; Yolanda Franks; Lori Lee Frantz-Burgin; James Steve Gerhardt; Bonni K. Gibson; Gwendolyn C. Giesen; Patricia Ann Golden; Priscilla Gordon-Wright; Gregory Gormley; Janet Gormley; C. Kay Gough; Deborah Hancock; Paul M. Harris; Susan Deneed Hasek; Lindsay Beth Haynes; Laurie Lee Hilderbrand; Monette J. Howell; Mary Beth Hunt; Patti D. Jackson; Mary E. Johnson; Sally Kibler; Kimberly W. Kirkendoll; Kristi A. Knorpp; Craig Alan Koenig; Kathleen G. Kovatch; R. Scot Lange; Shelly Lange; Britt Lemmons; Stephen C. Massanelli; Jean Matney; Jimmy E. May; Isqa Lylah Mclarty; Blair G. Mercer, Jr; Pamela F. Mitchell; James Weston Moffett; Thomas M. Pacha; Thomas R. Phillips; Abdel-Ilah Rahmoune; Cheryl D. Robinson; Pauline R. Roeder; Belinda Baxter Rogers; Lawrence A. Rothrock; Justina M. Sansom; Kimberly A. Saunooke; Yvonne E. Scobedo; Robert B. Shults; Craig B. Smith, Dorothy E. Snodgrass; Sue J. Sparks; Richard R. Spies; Kenneth Joseph Springfield; Tracey L. Talley; Gary W. Tallon; Connie Thesman, Ms; Sandy Wagnor; Denise Enise Wall; Sherry Lynn Watson; Genine A. Weiss; Bruce Wheeless; Debra S. Williams; V. Kay Williams; Valerie A. Williams; Richard D. Wilson; Diane P. Wood; Barry C. Wren; Thomas G. Zimmerman; Joseph Zorn, Plaintiffs-Appellants,

v.

FEDERAL ASSET DISPOSITION ASSN; Steven A. Seelig, Individually and as Director, FADA Oversight/Dissolution for the Resolution Trust Corporation and in his capacity as Fiduciary of the Retention Pay and Benefits Policies Issued by FADA; Federal Deposit Insurance Corporation, as Receiver for Federal Asset Disposition Association; The FADA Retention Pay And Benefits Policies, Defendants-Appellees.

Sept. 25, 1997.

1

Appeal from the United States District Court for the Northern District of Texas.

Before JOLLY, DUHÉ and EMILIO M. GARZA, Circuit Judges.

DUHÉ, Circuit Judge:

Appellants, eighty-three former employees of the Federal Asset Disposition Association, filed a class action suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* seeking benefits they claim are owed to them under their employer's severance plans. The district court denied the challenge. For reasons that follow, we affirm in part, reverse in part, and remand.

I

The Federal Asset Disposition Association ("FADA") was a federally-chartered savings and loan association wholly owned by the Federal Savings and Loan Insurance Corporation ("FSLIC"). FADA's sole function was to assist the FSLIC in managing and disposing the assets of failed thrifts that the FSLIC insured.

FADA was not a welcome entity on the savings and loan frontier. Almost from its inception in 1985, FADA came under extensive legislative attack. In 1988, Congress initiated efforts to abolish FADA, and in January 1989, Congress began consideration of legislation that would become the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1811 *et seq.,* which in all drafts included a provision to eliminate FADA. Understandably, FADA employees were constantly concerned about job security. In this context, FADA's Board of Directors adopted the following ERISA-protected severance plans (collectively, the

2

"Plans"):

*Policy No. 820:* This policy, adopted 3 May 1988, provided that employees terminated as a result of a reduction in force or job elimination necessitated by business reasons would receive, among other benefits, a lump sum separation payment at the time of termination equal to between one-half (1/2) and two (2) months pay depending on length of service.

*First Addendum:* This addendum, adopted on 29 September 1988, supplemented Policy No. 820 and was also known as the Employee Retention Plan. It provided that if FADA's charter was revoked or withdrawn, or if FADA was dissolved by act of Congress, "each employee who is in FADA's employ on the date of termination shall be paid, in one lump-sum payment, an amount of money ("severance benefit amount") equal to his or her then-current monthly salary, for four months.... This is in addition to benefits provided by [FADA] Policy No. 820."[1]

*Second Addendum:* This addendum, adopted on 2 May 1989, supplemented Policy No. 820, as amended by the First Addendum. According to the terms of the Second Addendum, the First Addendum was to remain in full force and effect.[2] The Second Addendum

---

[1]The First Addendum also provided that "[p]rior to any termination by Act of Congress, FADA shall prepay to the provider of major medical insurance coverage for Association employees, a prepayment on behalf of each employee equal to the monthly premium normally paid by FADA to such provider for the insurance coverage for that employee and his or her dependents for four months."

[2]The Second Addendum provided that "[n]othing in this Addendum is intended or shall be construed to change the application or interpretation of FADA Personnel Policy No. 820 or the Addendum to such Policy, dated September 29, 1988, and any payment of the

3

provided, in pertinent part, that any covered employee, as defined therein, "who, between May 2, 1989 and the Expiration Date, is given notice of termination of employment by FADA, for any reason other than cause, shall be entitled to the Severance Benefits, ... *provided, however,* that no Severance Benefits shall be payable pursuant to this subparagraph if, prior to the giving of notice of termination of employment by FADA: (i) a Sale shall have occurred, and (ii) the Successor shall have made a Comparable Offer of Employment to such employee[.]" So, in the event of a Sale, severance benefits were payable under the Second Addendum only if employees received notices of termination prior to receiving comparable job offers.

In August 1989, Congress passed FIRREA in an effort to resolve the burgeoning savings and loan crisis. FIRREA dissolved the FSLIC, and it mandated that 100% of FADA's capital stock, which the FSLIC had held, be transferred to the FSLIC Resolution Fund ("Fund"), *see* 12 U.S.C. § 1821a(a)(2)(A), which the Federal Deposit Insurance Corporation ("FDIC") managed, *see* 12 U.S.C. § 1821a(a)(1). Moreover, FIRREA directed that FADA be liquidated within 180 days of its passage. *See* FIRREA § 501(f), Pub.L. No. 101-73, 103 Stat. 183 (1989) (amended 1991). Overseeing these liquidation efforts was Appellee Steven A. Seelig, Director of the FDIC's Division of Liquidation. Seelig was also responsible for administering the FADA severance plans. In February 1990, FADA was

---

Severance Benefits as defined in this Addendum shall not be in derogation of any employee's right to the benefits described in FADA Personnel Policy No. 820."

4

placed into receivership, and the Resolution Trust Corporation ("RTC"),[3] an arm of the FDIC, was appointed FADA's receiver.

Seelig advised FADA management that two options were available for FADA's liquidation: either a sale of FADA to a third party purchaser or the merger of FADA into the RTC or the FDIC. In pursuit of the first option, efforts were made to sell FADA to a private entity, but those efforts were unsuccessful, and FADA employees were so advised in November 1989. Appellants contend that on the same or following day, they were also told they should consider themselves in receipt of notice that FADA would close, and that their jobs would terminate, on 31 December 1989. Appellees disagree, maintaining they did not give notice of termination until December 1989.

By 15 December 1989, the FDIC or the RTC offered to Appellants jobs comparable to those they had had at FADA. Some Appellants rejected these offers; FADA therefore sent them "Notice of Job Elimination" letters dated 21 December 1989, setting 5 January 1990 as their termination date. Appellees contend this letter was the first and only formal notice of termination FADA gave. Those Appellants who accepted the job offers began to work for the FDIC or the RTC on 2 January 1990 and were never sent "Notice of Job Elimination" letters.

In December 1989, Seelig, as Plan Administrator, determined that Appellants were ineligible for severance benefits under the

---

[3]Since these events occurred, the RTC has been succeeded by the FDIC.

Plans. Appellants thereafter filed suit under ERISA against FADA, Seelig, and the RTC (now the FDIC), seeking judicial review of Seelig's decision. After a bench trial, the court affirmed Seelig's decision. Appellants timely appeal.

## II

We review a district court's factual findings for clear error and its conclusions of law *de novo. See Reeves v. AcroMed Corp.,* 103 F.3d 442, 445 (5th Cir.1997) (citations omitted). Before reaching the merits of this case, we must address two preliminary issues.

## A

First, Appellees contest the district court's application of the *de novo* standard of review in its review of Seelig's determination as to Appellants' ineligibility for severance benefits. They insist the district court should have reviewed Seelig's determination for abuse of discretion only. We disagree. A reviewing court employs an abuse of discretion standard only when an ERISA plan gives to the plan administrator discretionary authority to construe the plan terms or to determine benefit eligibility. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989). Where, as here, the ERISA plans confer upon the administrator no such authority, the reviewing court must review the administrator's conclusions *de novo. See id.*[4] Following traditional principles of

---

[4]Appellants agree the proper standard is *de novo,* but they insist the district court, despite its statement to the contrary, reviewed Seelig's determinations for abuse of discretion.

6

contract and trust law, therefore, a reviewing court must construe a participant's claim " "as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent.' " *Sunbeam-Oster Co., Inc. Group Benefits Plan for Salaried and Non-Bargaining Hourly Employees v. Whitehurst,* 102 F.3d 1368, 1373 (5th Cir.1996) (quoting *Bruch,* 489 U.S. at 112-13, 109 S.Ct. at 955-56).

B

Next, Appellants argue that the Plans contain ambiguous terms that should be construed against Appellees under the doctrine of *contra proferentem.* This doctrine, which directs courts to resolve contractual ambiguities in insurance contracts against the drafter, has been held to apply to insurance contracts covered by ERISA. *See, e.g., Ramsey v. Colonial Life Ins. Co.,* 12 F.3d 472, 479 (5th Cir.1994). Whether the doctrine can also direct the resolution of ambiguity in severance plans covered by ERISA appears to be an issue of first impression for this Court. We need not reach its merits, however, because we conclude the district court correctly found that the Plans, when examined in their entirety, are susceptible to only one reasonable interpretation. That the

Appellants, however, fail to demonstrate that the court deferred to Seelig's interpretations of the Plans. They assert only that the court "ignored" testimony favorable to them. This argument, however, does not carry the day, and, as the district court pointed out, is not useful advocacy. The district court, as trier of fact, is responsible for making credibility determinations. That it made such determinations against Appellants is not proof that it applied an abuse of discretion standard. Our review of the court's orders and opinions reveals the court properly applied the *de novo* standard. Indeed, the court stated it reached its conclusions after a consideration of all the evidence.

7

parties may have interpreted the plans differently is of no moment. Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties. *See D.E.W., Inc. v. Local 93, Laborers' Int'l Union,* 957 F.2d 196, 199 (5th Cir.1992). Where, as here, "the written instrument is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous, and this Court will construe the contract as a matter of law." *Id.*

### III

The first substantive issue before us is whether the district court correctly found that Appellants are not entitled to severance benefits under the Plans. The court reasoned that the Plans, contrary to Appellants' position, do not constitute "Pay to Stay" policies designed to reward solely the services and loyalties of those employees who remained at FADA until its termination. Rather, the court found, the award of severance benefits under the Plans is conditional on the occurrence, or non-occurrence, of certain events, as outlined in the Second Addendum. Finding that such terms of the Second Addendum were not satisfied, the court denied Appellants' claim for severance benefits under all the Plans. Appellants challenge that finding for clear error. In particular, Appellants challenge both the district court's decision to read the Plans jointly rather than independently and the court's factual findings under various terms in the Second Addendum.

We agree with Appellants that the Plans should be read independent of one another. Language in the First Addendum and the

8

Second Addendum reveals that the three Plans provide benefits independent of the limitations, restrictions, or conditions of each other.[5] Each successive addendum enhanced, rather than superseded, the plan before it. In determining whether Appellants are entitled to benefits, therefore, we must examine each plan separately.

## A

We conclude the district court's denial of severance benefits under unamended Policy No. 820 is not clear error. Policy No. 820 was not a "Pay to Stay" policy; rather, it stated that eligible employees would receive benefits only if they were terminated as a result of a reduction in force or job elimination necessitated by business reasons. Appellants were terminated for neither of these reasons; rather, those who were terminated were terminated because they rejected the job offers extended by the FDIC or the RTC.

## B

We conclude the court did commit clear error, however, in denying benefits under the First Addendum, which was a "Pay to Stay" policy. Appellees insist that benefits are due under the First Addendum only in the event an employee has suffered a period of unemployment after his or her termination by FADA. In support, Appellees note that the First Addendum states its purpose is to

___

[5]The First Addendum states that the benefits afforded under it are "in addition to benefits provided by Association Policy No. 820." The Second Addendum states that "[n]othing in this Addendum is intended or shall be construed to change the application or interpretation of FADA Personnel Policy No. 820 or the Addendum to such Policy, dated September 29, 1988, and any payment of the Severance Benefits as defined in this Addendum shall not be in derogation of any employee's right to the benefit described in FADA Personnel Policy No. 820."

"provide assurance to personnel that if proposed legislation is successful and FADA's charter is withdrawn, [such personnel] will have *a reasonable period of opportunity, with income, to pursue other gainful employment.*" (emphasis added). Because Appellants suffered no unemployment, Appellees maintain, they are therefore not entitled to severance benefits under this plan. We disagree.

The paragraph from which Appellees extracted the sentence states in full:

I. *Purpose*

> An Employee Retention Plan, with appropriate incentives, will provide assurance to personnel that if proposed legislation is successful and FADA's charter is withdrawn, they will have a reasonable period of opportunity, with income, to pursue other gainful employment. This plan's objective is to ensure that FADA will retain the services of its employee base and not lose personnel through attrition because of justifiable concerns about the dissolution of FADA.

While the first sentence may support Appellees' position, the second sentence does not. A plain-language reading indicates that the purpose of the plan is to pay employees for staying with the company.

This plain-language reading is buttressed by the entitlement language of the plan itself. Unlike the Second Addendum, the First Addendum does not define eligibility with respect to a job termination. Rather, the First Addendum clearly states that "[i]n the event of a termination of FADA by an act of Congress resulting in revocation or withdrawal of FADA's charter or dissolution of the Association[,] each employee who is in FADA's employ on the date of termination shall be paid, in one lump-sum payment, an amount of

10

money ... equal to his or her then-current monthly salary, for four months as set forth below." Contrary to Appellees' position, nothing in this language indicates that payment of severance benefits is contingent upon unemployment. In the absence of such language, we will not construe eligibility to depend upon a period of unemployment. *See Bellino v. Schlumberger Tech., Inc.,* 944 F.2d 26, 31 (1st Cir.1991) ("Federal courts have established no hard and fast rule that an individual must suffer a period of unemployment to qualify for severance benefits under ERISA. Those courts that have deemed unemployment a prerequisite to such benefits have predicated their decisions on the particular terms of the ERISA plan at issue and its application to the specific facts before them."); *Barnett v. Petro-Tex Chemical Corp.,* 893 F.2d 800, 809 (5th Cir.1990) (recognizing that period of unemployment is not prerequisite for entitlement to termination pay and that each ERISA case is controlled by language of policy itself). Under the First Addendum, benefits are conditioned only upon FADA's statutory termination. FIRREA mandated that FADA liquidate within 180 days of its passage. *See* FIRREA § 501(f), Pub.L. No. 101-73, 103 Stat. 183 (1989) (amended 1991). Eligible Appellants are thus entitled to benefits under the First Addendum.[6]

---

[6]Appellees maintain the Plans should be read jointly as one policy. They suggest, therefore, that because a "Sale" of FADA occurred, Appellants can find relief, if at all, only under the Second Addendum. As we pointed out in note 5, *supra,* however, the plain language of the Second Addendum belies Appellees' claim. Moreover, under the section labeled "Scope", the Second Addendum states that the supplemental severance benefits it offers "shall not be available to any employee of FADA ... who is paid the severance benefit amount described in the Addendum to FADA

C

We conclude the district court's denial of severance benefits under the Second Addendum is not clear error.[7] Unlike the First Addendum, the Second Addendum is not a "Pay to Stay" policy. FADA owes no severance benefits under the Second Addendum if, prior to the time it gave notices of termination of employment, (i) a "Sale" had occurred and (ii) FADA's "Successor" had made a "Comparable Offer of Employment." Finding that a Sale had occurred and that Comparable Offers of Employment were timely made, the district court denied Appellants severance benefits. Appellants challenge the court's findings.

---

Personnel Policy No. 820, dated September 29, 1988 [*i.e., the First Addendum*]." In drafting the Second Addendum, therefore, FADA anticipated that employees could be eligible for benefits under both the First and Second Addendum. That a "Sale" of FADA occurred thus does not *a fortiori* foreclose eligibility under the First Addendum.

[7]This Court recognizes that its conclusion that eligible Appellants are entitled to benefits under the First Addendum may foreclose entitlement to benefits under the Second Addendum, in light of the following language:

> III. Scope
>
> The supplemental Severance Benefits described in Section II above shall not be available to any employee of FADA (i) *who is paid the severance benefit amount described in the Addendum to FADA personnel policy No. 820, dated September 29, 1988 [the First Addendum],* and (ii) for whom FADA either has (A) made available for a four month period ... major medical insurance coverage ... or (B) has paid to the employee ... a lump sum amount equal to [an insurance premium].... No employee shall be entitled to receive the Severance Benefits described herein more than once. (emphasis added).

We nevertheless will address the merits of the parties' arguments regarding entitlement under the Second Addendum in the event some Appellants would still qualify.

12

1

The Second Addendum defines "Sale" as, *inter alia,* (i) any change in the direct or indirect beneficial ownership of more than fifty percent (50%) of the capital stock of FADA effected by transfer of issued and outstanding shares, issuance of additional shares, or otherwise; or (ii) any transfer of the right to appoint or elect Directors constituting a majority of the Board of Directors of FADA. Upon passage of FIRREA, the FDIC acquired the right to appoint all of FADA's directors. Seelig, as Plan Administrator, thus determined that passage of FIRREA constituted a Sale under subsection (ii).[8] The district court agreed, and this finding is not clear error.[9]

2

Although a Sale had occurred, eligible Appellants could still receive benefits under the Second Addendum unless FADA's Successor gave eligible Appellants "Comparable Offers of Employment" before

---

[8]Appellants suggest that a "Sale" also occurred when, pursuant to FIRREA, 100% of FADA's capital stock was transferred to the Fund. We need not reach the merits of this issue. The terms of the Second Addendum require only that a "Sale" have occurred. The FDIC's acquisition of the right to appoint a majority of FADA's Board of Directors effected a "Sale." That a "Sale" may also have occurred upon transfer of 100% of FADA's capital stock is inapposite.

[9]Appellants complain that the passage of FIRREA cannot constitute a "Sale" for purposes of the Second Addendum because Seelig never communicated to them that any transaction or event other than a sale of FADA to a private buyer qualified as a "Sale." Seelig, however, was under no obligation under the Plans or otherwise to so communicate. The plain language of the Second Addendum stated what events constitute a "Sale." Appellants, therefore, were adequately notified of the definition of "Sale" upon receipt of a copy of the plan terms.

FADA gave them notices of termination of employment. The parties dispute which entity became FADA's Successor and when notices of termination were given.

The Second Addendum defines "Successor" as any person or entity that has acquired (i) the direct or indirect beneficial ownership of more than 50% of FADA's capital stock; or (ii) the right to appoint or elect Directors constituting a majority of FADA's Board of Directors. Under the second definition, the FDIC is clearly a Successor to FADA; upon passage of FIRREA, the FDIC had authority to appoint all of FADA's directors. Appellants insist, however, that the Fund, because it acquired 100% of FADA's capital stock upon passage of FIRREA, *see* 12 U.S.C. § 1821a(a)(2)(A), is also a Successor under the first definition. We disagree.

To be a Successor under the first definition, an entity must acquire *beneficial ownership* of more than 50% of FADA's capital stock. The Second Addendum does not define "beneficial ownership." We thus seek guidance from securities law, which defines "beneficial owner" for purposes of 15 U.S.C. §§ 78m(d) & (g), as follows:

> For the purposes of section 13(d) and 13(g) of the [Securities and Exchange Act of 1934, 15 U.S.C. § 78 *et seq.*] a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or

(2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

14

17 C.F.R. § 240.13d-3(a). A beneficial owner, therefore, has voting and/or investment power over the securities it purports to own. The Fund had no such ownership interests; indeed, it was merely an accounting creation, not a legal entity, that existed on paper only. Beneficial ownership of FADA's capital stock belonged to the FDIC, which had exclusive statutory authority to manage the Fund. *See* 12 U.S.C. § 1821a(a)(1). Such authority included the right to dispose of and to vote, or to direct the voting of, FADA's corporate stock.

The district court found that the FDIC, either on its own or through the RTC, gave Comparable Offers of Employment to Appellants. Appellants do not challenge that finding on appeal. They do challenge, however, whether such offers were extended before FADA gave notices of termination of employment.

3

Appellants contend they received notices of termination of employment in mid-November 1989, which is when they were also informed that FADA would not be sold to a private buyer and that FADA would likely close by year's end. The district court found otherwise, weighing the testimony before it in favor of Appellees, who maintain that notices of termination were not distributed until 21 December 1989. This finding is not clear error. Alternatively, Appellants argue that passage of FIRREA constituted notice of termination of employment. The district court disagreed, and we affirm. FIRREA mandated only that FADA terminate; it did not also announce that its passage constituted effective notice to FADA

15

employees of their termination of employment.

## IV

Citing various omissions or misrepresentations they allege Appellees made in connection with the interpretation and implementation of the Plans, Appellants next claim that FADA and Seelig violated fiduciary duties owed to Appellants. The district court found otherwise, explaining that Appellees never amended the Plans and neither misrepresented nor misled Appellants with respect to the Plans. The court found that, in fact, Appellees made sincere efforts to interpret and implement the Plans and to inform Appellants of their interpretations. This finding is not clear error.

Appellants next beseech this Court to estop Appellees from denying them severance benefits, claiming that "[a]ll of FADA's communications with them, including its policies, memos, and other statements," modified the Plans and led them to believe they were entitled to severance benefits if they stayed until FADA's termination. It is unclear to what "other statements" Appellants refer. To the extent Appellants' claim is based on FADA's purported oral communications, we reject it. An estoppel cause of action is not cognizable under ERISA in suits seeking to enforce rights to benefits based on purported oral modifications of plan terms. *See, e.g., Rodrigue v. Western and Southern Life Ins. Co.,* 948 F.2d 969, 971 (5th Cir.1991); *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1297 (5th Cir.1989) (concluding that oral agreements or modifications to ERISA plan are contrary to express provisions of

16

ERISA); *Degan v. Ford Motor Co.,* 869 F.2d 889, 895 (5th Cir.1989) (declining to create federal common law in this area, reasoning that this power extends only to areas that federal law preempts but does not address and noting that Congress has addressed the question of amendment in 29 U.S.C. § 1102(a)(1), which expressly requires that every employee benefit plan be established and maintained pursuant to a written instrument).

Whether an estoppel cause of action is cognizable under ERISA for written statements that purport to amend plan terms,[10] however, is an issue not squarely addressed by this Court.[11] We have considerable doubt as to whether such an action exists in the instant case. We need not resolve this issue, however, because even assuming, *arguendo,* that Appellants' estoppel action does exist, we conclude it nonetheless fails. To recover benefits under an equitable estoppel theory, an ERISA beneficiary must establish a material misrepresentation, reasonable and detrimental reliance upon the representation, and extraordinary circumstances. *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.,* 58 F.3d 896, 907 (3d Cir.1995) (citations omitted) (reaching estoppel claim based on alleged misrepresentations in summary plan descriptions). The district court rejected Appellants' estoppel claim, finding that Appellants failed to show that Appellees made material

_____

[10]We note, in any event, that the district court rejected Appellants' argument that memoranda issued by Seelig and FADA modified the Plans.

[11]This Court was faced with this precise issue in *Izzarelli v. Rexene Products Co.,* 24 F.3d 1506, 1517 (5th Cir.1994), but declined to reach it.

17

misrepresentations.[12] We agree. Moreover, even assuming, *arguendo,* that Appellants established material misrepresentations, we conclude Appellants have failed to demonstrate their reasonable reliance on such. Where, as here, a plan participant is in possession of a written document notifying her of the conditional nature of benefits, her "reliance on employer representations regarding benefits may never be "reasonable.' " *Id.* at 908.

V

Appellants next challenge the district court's dismissal of their compensatory and punitive damages claims against Seelig in his individual capacity. The district court based its decision on Supreme Court precedent holding that a plan fiduciary cannot be held personally liable, under ERISA's remedial provisions, to plan beneficiaries for extracontractual compensatory or punitive damages arising from an allegedly wrongful denial of benefits. *See Mertens v. Hewitt Assoc.,* 508 U.S. 248, 255-58, 113 S.Ct. 2063, 2068-70, 124 L.Ed.2d 161 (1993) (holding that ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which allows plan beneficiary to bring action to obtain "appropriate equitable relief" for violations of either ERISA or ERISA-qualified plan, does not allow such beneficiary to sue plan fiduciary in his or her individual capacity for extracontractual damages, which are "the classic form of *legal* relief" (emphasis in original)); *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96

---

[12]The district court reached Appellants' estoppel claim without discussing whether it exists in the first instance.

(1985) (holding that ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1), which allows plan beneficiary to bring action for fiduciary breach, does not allow such beneficiary to sue plan fiduciary in his or her individual capacity for extracontractual damages).

Pointing to the Supreme Court's recent decision in *Varity v. Howe,* --- U.S. ----, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), Appellants insist that both *Mertens* and *Russell* have been overruled. Appellants read *Varity* as holding that plan participants, under ERISA § 502(a)(3), can now recover extracontractual damages as a form of "appropriate equitable relief" from a plan fiduciary in his or her individual capacity. Appellants' reading is incorrect. *Varity* held nothing more than that ERISA § 502(a)(3) authorizes plan beneficiaries to bring a lawsuit on their own behalf for *injunctive* relief for a fiduciary breach. *See id.* at ----, 116 S.Ct. at 1077-79. *Varity* did not hold, as Appellants believe, that ERISA plan beneficiaries can sue plan fiduciaries for *extracontractual* relief for damages arising from a fiduciary breach. Indeed, the issue before the *Varity* Court was whether plan beneficiaries had a cause of action under ERISA § 502(a)(3) for *injunctive* relief. The district court's dismissal of Appellants' damages claims against Seelig is therefore proper.

VI

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for proceedings consistent with this opinion.

19