Cynthia BLUM, Plaintiff,

v.

**SPECTRUM RESTAURANT GROUP, INC., A/K/A NBACO, Inc., Spectrum Restaurant Group's Employees Group Life and Supplemental Life Plan, Hartford Life and Accidental Insurance Company, and Custom Benefit Consultants, Inc., Defendants.**

Nos. 4:02–CV–92, 4:02–CV–98.

United States District Court,
E.D. Texas,
Sherman Division.

April 28, 2003.

Grady Michael Gruber, Godwin Gruber, Dallas, TX, for Plaintiffs.

Scott Masur McElhaney, Jackson, Walker, Dallas, TX, for Defendants.

Thomas E. Sanders, Akin, Gump, Strauss, Hauer & Feld, San Antonio, TX, for Hartford Life and Accident Ins. Co.

Charles Cecil Keeble, Jr., Haynes & Boone, Dallas, TX, for Custom Benefit Consultants, Inc.

### *MEMORANDUM OPINION AND ORDER*

DAVIS, District Judge.

Defendants Spectrum Restaurant Group, Inc. ("SRG") and the Group Life and Supplemental Life Plan for Employees of Spectrum Restaurant Group (the "SRG Plan") and Hartford Life and Accident Insurance Company ("Hartford") (collectively "Defendants") have filed Motions for Summary Judgment (Docket Nos. 101 & 102). For the reasons articulated below, Defendants' Motions for Summary Judgment are **GRANTED.**

## BACKGROUND

Robert F. Blum ("Mr.Blum") was employed by Grandy's, Inc., which is owned and otherwise controlled by SRG. As a Grandy's employee, Mr. Blum was eligible to participate in certain benefit plans sponsored by SRG. One of those plans was the SRG Plan, a welfare benefit plan governed by ERISA that provided group term life insurance to eligible employees of SRG and its subsidiaries.

In October 1999, Custom Benefit Consultants, Inc. ("CBC") entered into an insurance brokerage and administrative services contract with SRG under which CBC: (1) assisted SRG, the named Plan Administrator, in procuring life insurance for SRG's employee benefit plans; and (2) agreed to provide services to SRG in connection with the administration of the SRG's employee benefits plans, including the SRG Plan. These services included handling certain enrollment and paperwork related to the administration of SRG's benefit plans, bringing insurance contracts to SRG, and handling communications regarding benefits.

In 2000, the SRG Plan offered basic and supplemental group term life insurance to eligible employees through the Principal Life Insurance Company ("Principal"). The SRG Plan consisted of two separate benefits: (1) a basic life insurance benefit affording life insurance to SRG employees such as Mr. Blum, which was purchased and paid for by SRG;[1] and (2) a voluntary supplemental life insurance benefit which could be purchased by SRG employees through their employment by way of a payroll deduction. Principal provided supplemental coverage to eligible employees for a guarantee minimum of $100,000, without proof of good health. Employees could also apply for additional supplemen-

tal coverage in an amount up to ten times one's annual salary, subject to a limit of $1,000,000 with proof of good health.

On November 19, 1999, Mr. Blum completed his enrollment application and elected basic life insurance and supplemental life insurance coverage in an amount equal to ten times his annual salary. On the same form, Mr. Blum stated that his salary was $90,000. Mr. Blum later signed two nearly identical "Confirmation of Your Enrollment Elections" forms: one on February 15, 2000, and another on April 20, 2000. Those forms reveal that Mr. Blum's "Elections" included $900,000 in supplemental life insurance. The forms remind Mr. Blum that "it is your responsibility to read and comply with the enclosed benefits policies." This election triggered the requirement under SRG's 2000 Plan that Mr. Blum (1) submit proof of good health, and (2) obtain the carrier's approval before he became entitled to a supplemental life insurance benefit in excess of the Guarantee Issue Amount. There is not evidence that Mr. Blum submitted proof of good health.

On May 23, 2000 and June 1, 2000, CBC sent additional reminder letters to SRG employees who had requested supplemental life insurance from Principal in excess of the Guarantee Issue Amount, but who had not completed the required medical questionnaire. On more than one occasion, Robin Sylvia, CBC's CEO, called Mr. Blum during 2000 about the requirement, reminding him that he needed to provide proof of good health.

On December 15, 2000, CBC sent Mr. Blum a memorandum explaining that Defendant Hartford Life and Accident Insurance Company ("Hartford") would be the insurer providing the Plan's life insurance in 2001. The memo further noted that

---

**1.** The basic life insurance benefit available to SRG administrative employees such as Mr. Blum in 2000 was $50,000.

Hartford offered a guaranteed supplemental life insurance coverage benefit up to $200,000.00 rather than Principal's guaranteed coverage of $100,000.00. This memorandum summarized Mr. Blum's situation and again reminded him of the need to submit a medical questionnaire:[2]

> Our records indicate that you elected [$972,000] in supplemental life insurance. However, do [sic] to pending medical approval, your current amount of supplemental life insurance coverage is [$0]. Effective January 1, 2001, you will be covered for the amount you elected up to $200,000.... If you elected supplemental life insurance in an amount over $200,000, you will need to complete a medical questionnaire from Hartford, which I will be sending you in a few days. Once medical underwriting approved you, payroll will begin deducting for the full coverage the first of month following approval date.

On December 15, 2000, CBC sent another memo to Mr. Blum regarding the supplemental life insurance available from Hartford under the Plan. That memo explained to Mr. Blum as follows:

> Hartford ... will only write coverage up to 5 X salary. Our records indicate that you elected 10 X salary for an amount of $972,000 in supplemental life insurance. Effective January 1, 2001 you will be covered for $200,000.

This memorandum further advised Mr. Blum that if he wished to obtain supplemental life insurance coverage in excess of the guaranteed amount, he would be required to complete a health statement and possibly complete a paramedical exam.[3]

A Plan Booklet containing the terms of the Plan applicable in 2001 was distributed to eligible SRG/Grandy's employees in 2001. The Plan Booklet contained a Hartford Certificate of Insurance and a Summary Plan Description. Mr. Blum received a copy of this Plan Booklet, as Mrs. Blum testified that she found a copy in Mr. Blum's desk.

The Plan Booklet provides that the "Policy Effective Date" was "January 1, 2001," with anniversary dates of January 1 of each year. The Plan Booklet explained that two types of life insurance were available: basic and supplemental. Under the heading "Basic Amount of Life Insurance," the Plan Booklet stated that the Plan offered life insurance in "An amount equal to 1 times Your annual rate of basic Earnings, rounded to the next higher multiple of $1,000, subject to a maximum of $50,000." Under the heading "Supplemental Amount of Life Insurance," the Plan Booklet stated that the Plan offered additional life insurance in "a Guaranteed Issue Amount equal to 1, 2, 3, 4, or 5 times Your annual rate of basic Earnings, subject to a maximum of $200,000 without Evidence of Good Health" or in "a maximum amount equal to 1, 2, 3, 4, or 5 times Your annual rate of basic Earnings, subject to a maximum of $500,000 with Evidence of Good Health." Further, the Plan Booklet noted that the "Guaranteed Issue Amount" was "the Amount of Insurance for which [Hartford] do[es] not require Evidence of Good Health." "Evidence of Good Health" was defined to mean "information about a person's health from which [Hartford could] determine if coverage or

---

**2.** Mrs. Blum claims that there is no evidence that Mr. Blum was ever provided with a medical questionnaire.

**3.** Individuals who, in 2000 (when the insurance was provided by Principal), had elected and been approved for amounts of supplemental life insurance over five time their salary or over $500,000 had their prior-approved amount of supplemental life insurance continued when Hartford became the insurer through Riders and Individual Endorsements to the Policy.

increases in coverage will be effective. Information may include questionnaires, physical exams, or written documentation, as required by [Hartford]."

The Plan Booklet also described the conditions under which "Evidence of Good Health" would be required. Such evidence would be required if "the Amount of Insurance You request exceeds the Guaranteed Issue Amount for each coverage. If Evidence of Good Health is not approved in this situation, You are eligible for the amount for which You enrolled, up to the Guaranteed Issue Amount." The Plan Booklet noted that when "the required claim papers are received and approved by [Hartford], the Amount of Life Insurance will be paid." The Plan Booklet also noted that Hartford had "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."

In October 2000, UltraLink, SRG and the SRG Plan entered into an agreement under which UltraLink agreed to provide an on-line employee benefits plan enrollment system which would allow SRG employees to enroll for employee benefits and review their benefit elections on a website. Pursuant to the agreement between UltraLink and SRG, UltraLink further agreed to take over, effective on or before June 1, 2001, certain administrative services for SRG and the SRG Plan from CBC. Specifically, UltraLink agreed to prepare benefit enrollment worksheets for SRG employees, set up a website where SRG employee's could enroll for and review their benefits, prepare confirmation worksheets for employees and prepare a payroll "change file" for SRG so it could make the proper deductions from its employees' paychecks for benefit premiums.

SRG held an open enrollment period for its benefit plans in June 2001, during which time SRG employees could change their benefit elections. At the same time, the on-line benefit plan enrollment system run by UltraLink was rolled out. In designing the on-line enrollment system, UltraLink neglected to provide a filter that effectively identified employees whose elected coverage had not been approved by the insurance carrier. More specifically, UltraLink did not apply a filter that would have recognized that employees who had elected more than the $200,000 guaranteed amount of supplemental life insurance, but who had not completed the process of receiving approval from the insurer, had coverage limited to $200,000.

On or about July 6, 2001, just after the June 2001 open enrollment was complete, CBC sent a letter to Mr. Blum and other SRG employees who had not submitted Evidence of Good Health.[4] The letter stated:

> Our records indicate that you elected additional coverage in Supplemental Life Insurance. In order for you to receive the additional amount requested, you will need to complete the enclosed Personal Health Statement. I have completed the Employer section. Once you complete the Employee section, please forward this form to Hartford Life at the address listed on the Instruction page. Once medical underwriting approves you, you will be notified and payroll will begin deducting for the full coverage on the first of the month following approval date.

The version of this letter sent to Mr. Blum contained a partially completed Personal Health Statement that was personalized to his situation.

There is no evidence that Mr. Blum ever submitted a Personal Health Statement or otherwise provided Evidence of Good

---

**4.** Mrs. Blum claims that there is no evidence that Mr. Blum ever received this letter.

Health to Hartford making him eligible for supplemental life insurance benefits in excess of $200,000, and Hartford never approved him for supplemental life insurance benefits of $1,000,000.

On June 28, 2001, UltraLink provided SRG with an electronic spreadsheet file showing the amounts to be deducted from the employees' July 16, 2001 paychecks. That file showed that SRG should deduct $78.47 from Mr. Blum's paycheck for supplemental life insurance. SRG input these amounts into its payroll system, and those amounts were then deducted from employees' paychecks. The first paychecks on which those amounts were deducted were on the paychecks distributed July 16, 2001.

This error in reporting the proper deductible amount resulted in the deduction of $78.47 from Mr. Blum's July 16, 2001 paycheck. UltraLink's computer programming error failed to incorporate a "cap" on the amount of supplemental life insurance benefits purchased by those SRG employees, including Mr. Blum, who had requested a supplemental life insurance benefit in excess of the $200,000 Guaranteed Issue Amount, but had failed to submit Evidence of Good Health in order to obtain Hartford's approval of a supplemental life insurance benefit in excess of the $200,000 Guaranteed Issue Amount. Due to this programming error, sixteen SRG employees, including Mr. Blum, who had requested life insurance in excess of the $200,000 Guaranteed Issue Amount mistakenly had premiums for the requested amount of supplemental life insurance, rather than the guaranteed amount, withheld from their paychecks regardless of whether those employees had submitted Evidence of Good Health as required by the Plan and regardless of whether the amount requested was in excess of the $500,000 maximum coverage amount.

Once they received their July 16, 2001 paychecks, SRG employees noticed that the amount of certain benefit deductions were incorrect. SRG asked CBC to conduct an audit of the UltraLink file/spreadsheet that contained the premium amounts identified by UltraLink. On Monday, July 23, 2001, CBC sent an email to SRG identifying erroneous payroll deductions for supplemental life insurance on sixteen employees' paychecks, including Mr. Blum's. There is no evidence that Hartford received the $78.47 payroll deduction from Mr. Blum's July 16, 2001 paycheck.

Mr. Blum died on July 20, 2001. SRG issued Mr. Blum's final paycheck on July 25, 2001. In that paycheck, SRG paid Mr. Blum his earnings through the date of his death, paid him for unused vacation time, and credited him $62.78 because SRG had deducted too much for supplemental life insurance benefits in the July 16, 2001 paycheck. SRG did not pay Hartford the increased premium.

On July 26, 2001, six days after Mr. Blum's death, Tim Kunes ("Mr. Kunes"), the Blum's financial advisor, accessed the UltraLink website and came across a confirmation statement. The July 26, 2002 website confirmation states: "Congratulations! Your elections are now complete.... When you exit this screen, your elections will be processed...." Then, under the heading "Your 2001 Benefit Elections," it shows Mr. Blum requested "supplemental life insurance–10 times his salary: Coverage Amount: $1,000,000." On July 30, 2001, UltraLink corrected the mistake on its website to indicate that Mr. Blum was only covered for $200,000 in supplemental life insurance benefits because his requested $1,000,000 of coverage had not been approved by the carrier.

Mr. Kunes completed a proof of death claim form on behalf of Mrs. Blum and forwarded it to CBC. In completing the "Employers Section" of the form, Mr.

Kunes indicated that Mrs. Blum was claiming $1,000,000 in supplemental life insurance benefits. Upon receiving the proof of death claim form, CBC changed the claim to $200,000 in supplemental life insurance benefits and forwarded the form to Hartford on August 2, 2001 along with Mr. Blum's Certificate of Death.[5]

On August 14, 2001, Hartford approved Mrs. Blum's claims for $50,000 in the basic coverage, $200,000 in supplemental coverage, and $400,000 in accidental death and disability benefits, for a total of $650,000. Hartford subsequently paid this amount to Mrs. Blum. On October 19, 2001, Hartford's legal department received a demand letter for $1,150,000 from Mrs. Blum's attorney alleging misrepresentations and deceptive practices by Hartford in the handling of Mrs. Blum's claim for life insurance benefits. In this letter, Mrs. Blum's attorney alleged that Hartford had received a premium payment deducted from Mr. Blum's July 14, 2001 paycheck, that corresponded to $1,000,000 in supplemental life insurance and that this amount of supplemental life insurance had been previously confirmed to Mr. Blum. This was the first time Hartford became aware that Mrs. Blum was claiming $1,000,000 in supplemental life insurance benefits.

On November 25, 2001, Hartford received a time line and attachments prepared by CBC that: (1) chronicled Mr. Blum's life insurance coverages with Principal and Hartford; (2) revealed that Mr. Blum had never submitted evidence of good health under both Plans; and (3) CBC's efforts to have Mr. Blum submit such evidence. Further, the time line explained that the paycheck deduction referenced by Mrs. Blum's attorney ($78.47 deducted from Mr. Blum's July 16, 2001 paycheck) was the result of a one time computer system error, which was caught and subsequently corrected.

On November 26, 2001, Hartford received a fax from SRG with Mr. Blum's payroll history showing his deductions from January 1, 2001 through August 13, 2001. The history showed that for the first time on July 16, 2001, $78.47 was deducted from Mr. Blum's paycheck for life insurance and that the overcharge of $62.78 was refunded to him on his final paycheck, after his death.

On December 13, 2001, Hartford sent a letter to Mrs. Blum's attorney explaining that Mr. Blum did not have supplemental life insurance coverage over the guaranteed issue amount due to Mr. Blum's failure to submit evidence of good health, that Hartford had not received a premium payment for a $1,000,000 supplemental life benefit, and that Hartford had paid the proper benefit amount to Mrs. Blum.

On February 13, 2002, Hartford received a request for an appeal of Hartford's decision from Mrs. Blum's attorney. The entire administrative record and Mrs. Blum's attorney's appeal letter were sent to Hartford's Appeal Unit for handling. On March 25, 2002, while the administrative appeal process was still ongoing, Mrs. Blum filed suit against SRG, the SRG Plan, and Hartford for wrongful denial of

---

**5.** Mrs. Blum claims that this constitutes forgery. There is a dispute as to whether Mr. Kunes was informed by CBC they were going to make the change to the proof of death form. CBC argues that in correcting the proof of death claim form it was complying with the requirements that (1) the employer certify that the information contained in the Statement of Employer section, including the amount of supplemental life insurance being claimed, is true and correct according to the records of the employer, and (2) furnishing materially false information to Hartford would constitute insurance fraud and a crime. Because of this obligation, CBC argues that correction of the form was entirely appropriate and legal.

life insurance benefits under ERISA. On April 10, 2002, Robert Dombrowski of Hartford's Appeal Unit, upheld Hartford's decision, after reviewing all the information in Hartford's administrative record.

In her First Amended Complaint, Mrs. Blum has asserted state law claims for fraud and violations of the Texas Deceptive Trade Practices Act ("DTPA"). The state law claims were previously dismissed. In addition, Mrs. Blum has asserted federal common law claims for equitable estoppel and waiver, and further, violation of ERISA Section 502(a)(1)(B).[6] Defendants have filed a Motion for Summary Judgment on these claims to which the Court now turns.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998). An issue of material fact is genuine if the evidence could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue for trial exists, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505;

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must assert competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994). The party opposing summary judgment is required to identify evidence in the record and articulate the manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment must be granted if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## ERISA SECTION 502(a)(1)(B)—SRG

■ SRG argues that it is not a proper defendant to Mrs. Blum's wrongful denial of benefits claim under Section 502(a)(1)(B). There is a split in authority regarding whether a plan is the only proper defendant in a suit to recover benefits under ERISA. In *Gelardi v. Pertec Com-*

---

**6.** Mrs. Blum also asserted state law claims for fraud, negligent misrepresentation, violation of the Texas Insurance Code, violation of the Texas Deceptive Trade Practices Act ("DTPA"), breach of contract, and intentional infliction of emotional distress against CBC. In addition, Mrs. Blum has asserted federal common law claims for equitable estoppel and waiver, and further, violations of ERISA Sections 502(a)(1)(B) and 502(a)(3) against CBC. The Court previously granted CBC's Motion for Summary Judgment as to all claims.

*puter Corp.,* the Ninth Circuit determined that ERISA permits suits to recover benefits under section 502(a)(1)(B) to be brought only against the plan as an entity. 761 F.2d 1323, 1324–25 (9th Cir.1985) (per curiam); *accord Riordan v. Commonwealth Edison Co.,* 128 F.3d 549, 551 (7th Cir.1997) ("It is true that ERISA permits suits to recover benefits only against the plan as an entity.") (citing *Jass v. Prudential Health Care Plan, Inc.,* 88 F.3d 1482, 1490 (7th Cir.1996)); *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) (same). In so concluding, the *Gelardi* court cited to section 1132(d)(2) of ERISA, which provides:

> Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.

In contrast to *Gelardi,* the Third Circuit has determined that ERISA permits an entity other than a plan to be sued to recover benefits if that entity is a fiduciary with sufficient discretionary authority and responsibility in the administration of the plan. *See Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 233 (3d Cir. 1994); *see also Layes v. Mead Corp.,* 132 F.3d 1246, 1249 (8th Cir.1998) (proper party against whom claim for ERISA benefits may be brought is party that controls administration of the plan); *Garren v. John Hancock Mut. Life Ins. Co.,* 114 F.3d 186, 187 (11th Cir.1997) (same); *Daniel v. Eaton Corp.,* 839 F.2d 263, 266 (6th Cir.1988) (employer can be proper party defendant in action under section 1132(a)(1)(B) if shown to control plan administration). Although the Fifth Circuit has not yet addressed this issue, other district courts in this circuit have agreed with the Ninth Circuit's holding in *Gelardi* that the only proper defendant in a suit to recover bene-

fits is the plan. *See, e.g., Murphy v. Wal–Mart Assocs.' Group Health Plan,* 928 F.Supp. 700 (E.D.Tex.1996) (no action against claims administrator for recovery of benefits under section 1132(a)(1)(B)); *Crawford v. Exxon Corp.,* 851 F.Supp. 242, 244 (M.D.La.1994) (granting summary judgment in Exxon's favor "because ERISA only provides for suits against the Plan as an entity to recover benefits"); *Holloway v. HECI Exploration Co. Employees' Profit Sharing Plan,* 76 B.R. 563, 570 (N.D.Tex.1987) (citing *Gelardi* and 29 U.S.C. § 1132(d)), *aff'd,* 862 F.2d 513 (5th Cir.1988).

Mrs. Blum relies on an Eastern District of Louisiana case, *Musmeci v. Schwegmann Giant Super Markets,* 159 F.Supp.2d 329 (E.D.La.2001). The *Musmeci* case involved a claim by retirees of Schwegmann Giant Supermarkets "to have their retirement grocery vouchers and/or monetary payments reinstated" after Schwegmann "terminated the voucher program ... when it sold its chain of grocery stores." *Id.* at 333. The Court concluded that the grocery voucher program at issue was in fact a pension benefit plan covered by ERISA, even though there was no formal, written plan and the vouchers were paid for out of the company's general revenues. *Id.* at 341–42. Next, the court found that "under the facts of th[e] case," the plaintiffs could sue the company directly because the plan was "unfunded, paid from the [company's] assets, and completely controlled and administered by officers and employees of the [company]." *Id.* at 352. In particular, the Court held:

> [W]here the employer is the plan administrator and the employer and the plan are otherwise "closely intertwined," plaintiff may state a cause of action against the employer for benefits due. *Neuma, Inc. v. AMP, Inc.,* 259 F.3d 864 (7th Cir.2001) (citing *Mein v. Carus Corp.,* 241 F.3d 581 (7th Cir.2001); *Rior-*

*dan v. Commonwealth Edison Co.*, 128 F.3d 549 (7th Cir.1997)). In *Slaughter v. AT & T Information Systems, Inc.*, 905 F.2d 92, 94 (5th Cir.1990), the Fifth Circuit endorsed this approach where an ERISA plan has no existence apart from the corporate employer and is an unfunded benefit plan self-administered by the employer. In such a situation, the plan is merely a nominal defendant with the true party in interest being the employer. *See id.*

*Id.* at 352.

Mrs. Blum argues that SRG is a proper party because SRG and the SRG Plan are "closely intertwined" because the SRG Plan does not have its own office, telephone, or employees. The Court disagrees. ERISA recognizes a plan to be separate legal entity capable of suing and being sued, 29 U.S.C. § 1132(d)(1) ("An employee benefit plan may sue or be sued under this subchapter as an entity."); *id.* at § 1002(1) & (3) (defining an employee benefit plan to be a plan established by an employer to provide benefits). ERISA requires a plan to be maintained "pursuant to a written instrument," *id.* at § 1102(a)(1), and to promulgate a Summary Plan Description (SPD), *id.* at § 1022. In this case, SRG, the plan sponsor and plan administrator in name, has observed these legal requirements.

This case is also distinguishable from *Musmeci* because: (1) Mrs. Blum acknowl-edges that insurance coverage was provided through Hartford and (2) Mrs. Blum has properly sued Hartford for the benefits she alleges she is owed. Further, unlike *Musmeci*, the SRG Plan has an existence apart from SRG and is a funded benefit plan administered by Hartford. Also, unlike *Musmeci*, this is not a situation where the plan is merely a nominal defendant. Thus, SRG is not a proper defendant under ERISA Section 502(a)(1)(B). Even if SRG is a proper party, as discussed below, the Court concludes that Plan Administrator gave the SRG Plan a legally correct interpretation and she did not abuse her discretion.

## STANDARD OF REVIEW

▬ An administrator's denial of benefits under an ERISA plan is "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (citation omitted). Because the language of the Policy gives Hartford such discretion, the Court applies the abuse of discretion standard. *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601 (5th Cir.1994).[7] When applying the abuse of discretion standard, the Court "analyzes whether the plan administrator acted arbitrarily and

---

7. Mrs. Blum argues that the *de novo* standard should apply because SRG had no authority to construe the plan terms or determine benefit eligibility even though SRG is named as the Plan Administrator. The record abundantly establishes that Hartford was the administrator and fiduciary with respect to paying insurance claims. It had discretionary authority in deciding such claims, and accordingly the abuse of discretion standard applies. Although the plan summary identifies the SRG as the plan administrator, Hartford was indisputably the plan administrator and fiduciary with respect to paying insurance claims. Hartford was therefore the plan administrator with respect to claims, because it was "the person specifically so designated by the terms of the instrument under which the · plan is operated." 29 U.S.C. § 1002(16)(A)(i). Hartford was also a fiduciary with respect to such claims if it "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.* § 1002(21)(A)(iii). In fact Hartford had complete discretionary authority to decide claims.

capriciously." *Id.* (quoting *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir.1992)). A decision is arbitrary when made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir.1996). An administrator's decision to deny benefits must be "based on evidence, even if disputable, that clearly supports the basis for its denial." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir.1999). The Court must find that "[w]ithout some concrete evidence in the administrative record that supports the denial of the claim, ... the administrator abused its discretion." *Id.* at 302.

■ A "sliding scale" is applied to the abuse of discretion standard where it is determined that the administrator has acted under a conflict of interest. *Id.* at 296. "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id.* at 297. When a minimal basis for a conflict is established, we review the decision with "only a modicum less deference than we otherwise would." *Id.* at 301. In the case at bar, Hartford has an inherent conflict of interest because it is the insurer and has acted as the plan administrator and the claims administrator, determining eligibility for benefits and denying claims made under the Policy.

Further, outside of the fact that Hartford both insures and administers the policy (i.e. the minimal basis for conflict), there is no evidence with respect to the degree of conflict. Accordingly, in accordance with the Fifth Circuit's "sliding scale" approach, the Court reviews the Plan Administrator's decision under an abuse of discretion standard, giving due consideration the possibility that the Plan Administrator may have acted under a conflict of interest.

■ The Fifth Circuit has made it clear that "the administrative record consists of the relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300.[8] Further, the Fifth Circuit has held that once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions. *Id.* Those exceptions have been limited to either interpreting the plan or explaining medical terms and procedures relating to the claim. *Id.* Accordingly, evidence related to how an administrator has interpreted terms of the plan in other instances is admissible. *Id.* (citing *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 639 & n. 15 (5th Cir.1992)(compiling cases)). Further, evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim would be equally admissible.

8. Mrs. Blum argues that Hartford's administrative record is an incomplete sham and, therefore, this Court should consider evidence outside the administrative record. However, the proper remedy for an incomplete administrative record would be a remand to the plan administrator, not the consideration of evidence outside the administrative record by a district court. *See, e.g., Barhan v. Ry–Ron, Inc.*, 121 F.3d 198, 202 n. 5 (5th Cir.1997); *Moller v. El Campo Aluminum Co.*, 97 F.3d 85, 88–89 (5th Cir.1996); *Miller v. United* *Welfare Fund*, 72 F.3d 1066, 1071–72 (2d Cir. 1995). Yet, Mrs. Blum has not requested that this case be remanded to the Plan Administrator and, further, Mrs. Blum asserts that either all administrative remedies have been exhausted or that the pursuit of administrative remedies in this case would be futile. Thus, this Court is left with limiting its review to the administrative record in considering Mrs. Blum's ERISA claim. *See, e.g, Meditrust Fin. Servs. Corp.*, 168 F.3d at 215.

*Id.* However, the Fifth Circuit has made clear that the district court is precluded from receiving evidence to resolve disputed material facts. *Id.* Based on these standards, the Court will limit its review to the evidence in the administrative record. *See, e.g., Meditrust Fin. Servs. Corp. v. Sterling Chemicals, Inc.,* 168 F.3d 211, 215 (5th Cir.1999); *Schadler v. Anthem Life Insurance Company,* 147 F.3d 388, 394–95 (5th Cir.1998); *Thibodeaux v. Continental Cas. Ins.,* 138 F.3d 593, 595 (5th Cir.1998); *Barhan v. Ry–Ron Inc.,* 121 F.3d 198 (5th Cir.1997); *Bellaire General Hosp.,* 97 F.3d at 828–29; *Sweatman,* 39 F.3d at 597–98; *Duhon v. Texaco Inc.,* 15 F.3d 1302, 1306–07 (5th Cir.1994); *Southern Farm Bureau Life Ins. Co. v. Moore,* 993 F.2d 98, 101–02 (5th Cir.1993); *Wildbur,* 974 F.2d at 639.[9]

## ABUSE OF DISCRETION STANDARD

■■■■ Application of the abuse of discretion standard may involve a two-step process. *Wildbur,* 974 F.2d at 637. This procedure requires the Court to first determine the legally correct interpretation of the plan and then to examine whether the administrator applied the same. If the administrator failed to apply a legally correct interpretation of the plan, the Court must then determine whether the administrator's actions constituted an abuse of discretion. *Id.* When determining the legally correct interpretation of the plan, the Court must look to: (1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with the fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. *Id.* at 638 (citing *Jordan v.*

*Cameron Iron Works, Inc.,* 900 F.2d 53, 56 (5th Cir.1990)).

■■■■ If the administrator has applied a legally correct interpretation of the plan, then no further inquiry is required. *See, e.g., Chevron Chemical Co. v. Oil, Chemical & Atomic Workers Local Union 4–447,* 47 F.3d 139, 146 (5th Cir.1995); *Haubold v. Intermedics, Inc.,* 11 F.3d 1333, 1341 (5th Cir.1994). However, if the Court determines that the administrator's interpretation is legally incorrect, then it must evaluate whether that interpretation constitutes an abuse of discretion. In conducting this analysis, the Court must look to: (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith. *Wildbur,* 974 F.2d at 638 (citing *Batchelor v. International Brotherhood of Elec. Workers Local 861 Pension and Retirement Fund,* 877 F.2d 441, 445–48 (5th Cir.1989)).

■■■■ If a benefits denial is supported by substantial evidence and is not erroneous as a matter of law, it is not arbitrary nor capricious, and therefore is not an abuse of discretion. *See Wildbur,* 974 F.2d at 637 n. 12. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Girling Health Care, Inc. v. Shalala,* 85 F.3d 211, 215 (5th Cir.1996) (quoting *Richardson v. Perales,*

9. The Court notes that the factual background section of this Memorandum Opinion and Order contains certain facts that are outside the administrative record. These facts are pertinent to Mrs. Blum's federal common law waiver and equitable estoppel claims and will be considered only when addressing those

claims. Mrs. Blum's claim for denial of benefits under Section 502(a)(1)(B) will be limited to Hartford's Administrative Record which is attached to Hartford's Motion for Summary Judgment, Ex. M, Hart 00001–00154 & 00232.

402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted)).

### i. The Legally Correct Interpretation

None of the parties have addressed whether the administrator has given the plan a uniform construction and, further, whether any unanticipated costs result from different interpretations of the plan nor is there any evidence in the record for the Court to analyze as to these elements. Thus, the Court is left with addressing whether the Plan Administrator's interpretation is consistent with the fair reading of the plan.

Mrs. Blum argues that the SRG Plan is ambiguous. The interpretation of an ERISA plan is governed by federal common law. *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451 (5th Cir.1995). Nevertheless, in developing federal common law, the courts may draw on analogous state law. *Id.* Whenever possible, insurance policies should be interpreted according to their plain meaning. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984). In construing ERISA plan provisions, the court interprets the contract language in an ordinary and popular sense as would a person of average intelligence and experience. In essence, the words of insurance contracts should be given their ordinary and generally accepted meaning if there is one. *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir.1997) (citing *Todd,* 47 F.3d at 1451 n. 1). Only if the terms remain ambiguous after applying ordinary principles of contract interpretation is the court compelled to apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured. *Todd,* 47 F.3d at 1451–52. Accordingly, application of the principles of contract interpretation of the terms of an ERISA policy or plan require the court to apply the plain language of the policy.

Mrs. Blum makes four arguments in favor of ambiguity: (1) that the SRG Plan does not state what is required to provide sufficient "Evidence of Good Health;" (2) the Plan Booklet does not specify the manner in which the "Employer and/or Benefit Administrator" would notify an employee of any approval and the SRG Plan does state that any disapprovals would be notified in writing; (3) that Marcella Fulton, Hartford's Senior Claims Examiner who has full and sole authority on behalf of Hartford to interpret the SRG Plan as it related to Mr. Blum's supplemental life insurance coverage, stated that under the terms of the SRG Plan, "Evidence of Good Health" is not mandatory for life insurance coverage to begin; and (4) there were "exceptions" created to the purported $500,000 cap of supplemental life insurance coverage. The Court will address each argument in turn.

The SRG Plan describes "Evidence of Good Health" as: "information about a person's health from which We can determine if coverage or increases in coverage will be effective. Information may include questionnaires, physical exams, or written documentation as required by Us." Mrs. Blum argues that the SRG Plan is ambiguous because the SRG Plan does not specify exactly what is required for "Evidence of Good Health." However, Mrs. Blum's argument is misplaced. Because there is no evidence Mr. Blum submitted to or for Hartford (or Principal) "Evidence of Good Health", there is no need for this Court to interpret what is sufficient to constitute "Evidence of Good Health" in this case. *Cf. Gupta v. Freixenet, USA, Inc.*, 908 F.Supp. 557, 564 (E.D.Ill.1995) (dismissing claim for plan benefits where plan "unambiguously require[d] submission of proof of good health" and plaintiff did not "submit[ ] proof of good health at any time"); *Karl v. Guardian Life Ins. Co. of Am.*, 790 F.Supp. 569, 572 (D.Md.1992) (similar).

Mrs. Blum also argues that the Plan Booklet does not specify the manner in which the "Employer and/or Benefit Administrator" would notify an employee of any approval and the Plan Booklet does state that any disapprovals would be notified in writing. Mrs. Blum claims that since no disapproval was sent to Mr. Blum he must have submitted the required information to Hartford and been approved. This is based on pure speculation. There is no evidence in the administrative record or outside the administrative record that Mr. Blum ever submitted "Evidence of Good Health" nor is there any evidence that he was ever "approved" for any amount of supplemental life insurance above the Guaranteed Issue Amount. Further, this argument, even if true, does not support a claim that the SRG Plan is ambiguous.

 Mrs. Blum's other arguments are equally unavailing.[10] Next, Mrs. Blum argues that Marcella Fulton ("Ms.Fulton"), Hartford's Senior Claims Examiner who has full and sole authority on behalf of Hartford to interpret the SRG Plan as it related to Mr. Blum's supplemental life insurance coverage, stated that under the terms of the SRG Plan, "Evidence of Good Health" is not mandatory for life insurance coverage to begin and, thus, this implies that Mr. Blum did not need to submit "Evidence of Good Health." At first glance this argument seems compelling. However, as the Plan Booklet explains, supplemental life insurance coverage under the SRG Plan in 2001 could begin without "Evidence of Good Health" for any amount *up to the Guaranteed Issue Amount* of $200,000. For any amount of supplemental insurance above $200,000 to become effective, Hartford had to approve the election and required "Evidence of

Good Health" to do so. Thus, Ms. Fulton's statement does not lead to an ambiguity in the SRG Plan.

Mrs. Blum also finds significance from the fact that certain individuals who had elected and been approved for amounts of supplemental life insurance over five time their salary or over $500,000 had their prior approved amount of supplemental life insurance continued when Hartford became the insurer. These Riders and Individual Endorsements to the Policy do not render the SRG Plan or the Policy ambiguous. Because riders and endorsements are considered part of an insurance policy, the Rider and Individual Endorsements to the Hartford Policy that identify and cover grand fathered employees are a part of the Hartford Policy, not exceptions to it. *See, e.g., Bartley v. Nat'l Union Fire Ins. Co.,* 824 F.Supp. 624, 632 (N.D.Tex.1992). Further, the Court cannot find any reasons that this makes the Plan Booklet ambiguous, nor has Mrs. Blum asserted one.

As state above, the Policy provides that Evidence of Good Health is required when an employee requests an amount of coverage that "exceeds the Guarantee Issue Amount." Evidence of Good Health is defined as "information about a person's health from which we can determine if coverage or increases in coverage will be effective. Such information may include questionnaires, physical exams, or written documentation as required by us." Further, the Policy states that "if Evidence of Good Health is not approved, you are eligible for the amount for which you enrolled, up to the Guaranteed Issue Amount." The Policy language is clear and unambiguous-the insured must submit information about their health from which Hartford can de-

---

10. The Court notes that the next two arguments are based on extrinsic evidence and, thus, should not typically be considered un-

less the language of the Plan is ambiguous. Here, the Plan is unambiguous. Nevertheless, the Court will look at this evidence.

termine if coverage will be extended and Hartford must approve the Evidence of Good Health in order for the insurance to obtain additional supplemental benefits.

Based on the foregoing, the Court concludes that the Plan Administrator's interpretation is consistent with a fair reading of the SRG Plan. With this said, the Court is not obligated to conduct any further inquiry. *See, e.g., Chevron Chemical Co.,* 47 F.3d at 146.

### ii. Application of the Abuse of Discretion Standard

██ Even if the Court were to find that the Plan Administrator applied a legally incorrect interpretation of the Plan, it would still validate the Plan Administrator's ultimate decision to deny the supplemental life insurance benefits to Mrs. Blum under the applicable abuse of discretion standard. The Court finds that the summary judgment evidence shows that the Policy only offered a maximum of $200,000 in benefits without Evidence of Good Health and a maximum of $500,000 with Evidence of Good Health. There is ample evidence in the administrative record with the information provided by SRG and CBC, on behalf of the SRG Plan, together with confirmation from Hartford's Medical Underwriting Department that Mr. Blum did not submit Evidence of Good Health and, accordingly, did not have supplemental life insurance coverage in excess of the Guarantee Issue Amount of $200,000. Accordingly, the Plan Administrator did not abuse her discretion.

In sum, in light of the stringent legal standard under which this Court is required to review the Plan Administrator's decision, the Court determines that the Plan Administrator applied a legally correct interpretation of the Plan, and did not abuse his discretion in denying supplemental life insurance benefits to Mrs. Blum as a matter of law.

### BARS TO DENIAL OF BENEFITS

Mrs. Blum argues that the following documents bar and/or waive Hartford's right to deny Mrs. Blum the supplemental life insurance benefits: (1) Mr. Blum's check stub showing a premium withheld for life insurance benefits under the SRG Plan; (2) a benefit enrollment worksheet showing Mr. Blum's election of supplemental life insurance benefits under the SRG Plan in the amount of ten time his annual salary; (3) a page printed from UltraLink's website confirming that Mr. Blum had elected supplemental life insurance benefits coverage in the amount of ten times his annual salary; and (4) an alleged "forgery" by CBC to Mrs. Blum's Hartford Proof Death claim form. Mrs. Blum maintains that these documents led Mr. Blum to believe that he was insured for approximately $1,000,000 in supplemental life insurance benefits and, thus, Defendants are estopped and have waived their right to deny the supplemental life insurance benefits.

### i. Equitable Estoppel

██ The Fifth has held that an oral agreement cannot sustain an equitable estoppel cause of action under ERISA. *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1297 (5th Cir.1989); *see also Rodrigue v. Western and Southern Life Ins. Co.,* 948 F.2d 969, 971–72 (5th Cir.1991) (holding plaintiff precluded from arguing that employer was estopped from denying coverage based on oral modifications to plan); *Degan v. Ford Motor Co.,* 869 F.2d 889, 895 (5th Cir.1989) (ERISA precludes oral modifications to plan and as well as claims of promissory estoppel in suit seeking to enforce rights to pension benefits). However, the representations in the instant matter were written rather than oral. The Fifth Circuit has never directly addressed whether a beneficiary can bring an estoppel claim based on alleged written misrep-

resentations. *See Izzarelli v. Rexene Products Co.*, 24 F.3d 1506, 1517 (5th Cir. 1994) (declining to address the issue); *Weir v. Federal Asset Disposition Ass'n,* 123 F.3d 281, 290 (5th Cir.1997) (declining to address the issue and expressing doubt as to whether a cause of action for estoppel is cognizable under ERISA based upon written statements); *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 513 (5th Cir.2000) (noting that the Fifth Circuit "has never adopted 'ERISA estoppel,' and has in fact expressed doubt as to whether a cause of action for estoppel is cognizable under ERISA based upon written statements"). In *Weir,* the Fifth Circuit did not address whether such a cause of action exists, but did state, assuming that such an action existed, an ERISA beneficiary "must establish a material misrepresentation, reasonable and detrimental reliance upon the representations, and extraordinary circumstances." 123 F.3d at 290 (citing *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.*, 58 F.3d 896, 907 (3d Cir.1995) (citations omitted)). The Court went on to hold that:

> even assuming, *arguendo,* that Appellants established material misrepresentations, we conclude Appellants have failed to demonstrate their reliance on such. Where, as here, a plan participant is in possession of written document no-

tifying her of the conditional nature of benefits, her "reliance on employer representations regarding benefits may never be 'reasonable.'"

*Id.* (citation omitted).[11] This last sentence indicates that the plan itself must be ambiguous to bring such a claim. Other Circuits have found that estoppel "only comes into play when the terms of a plan are ambiguous" and "estoppel may only be used where the communications constituted an interpretation of that ambiguity." *See, e.g., Alday v. Container Corp. of Am.*, 906 F.2d 660, 666 (11th Cir.1990); *Pisciotta v. Teledyne Indus.*, 91 F.3d 1326, 1331 (9th Cir.1996); *Sprague v. General Motors Corp.*, 133 F.3d 388, 403–04 (6th Cir.1998); *Fink v. Union Central Life Ins. Co.*, 94 F.3d 489, 492 (8th Cir.1996); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 458 n. 12 (11th Cir.1996), *cert. denied,* 519 U.S. 1149, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997). This Court finds at least two reasons for this rule. First, as the elements for estoppel reveal, reasonable or justifiable reliance by the party asserting the estoppel is required. That party's reliance can seldom, if ever, be reasonable if it is inconsistent with the clear and unambiguous terms of plan documents available to the party. Second, to allow estoppel to override the clear terms of plan documents

---

11. It seems the circuit courts have come up with different answers to the question of whether to create estoppel claims as a matter of federal common law. *See, e.g., HealthSouth Rehabilitation Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1010 (4th Cir.1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2432, 138 L.Ed.2d 194 (1997) ("we have never recognized estoppel arguments which would serve to vary the terms of a written plan"); *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990) (allowing an estoppel claim but only in claims for benefits under an unfunded single-employer welfare benefits plans); *Nachwalter v. Christie,* 805 F.2d 956 (11th Cir.1986) (allowing estoppel claims only when the representation interprets an ambig-

uous plan term and does not modify the plan itself). Further, circuit courts have defined different elements that need to be satisfied. *See, e.g., Schonholz v. Long Island Jewish Medical Ctr.*, 87 F.3d 72, 78–79 (2d Cir.1996) (setting forth five elements of a promissory estoppel claim: "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, (4) an injustice if the promise is not enforced," and (5) "extraordinary circumstances."); *Curcio v. John Hancock Mutual Life Ins. Co.*, 33 F.3d 226, 238 (3d Cir.1994) ("To succeed under this theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances.").

would be to enforce something other than the plan documents themselves. That would be inconsistent with ERISA.[12]

Assuming that the Fifth Circuit would recognize an equitable estoppel claim and, further, assuming the Fifth Circuit would adopt the Third Circuit's approach,[13] the Court concludes that the Ms. Blum's equitable estoppel claims fail as a matter of law. In the Third Circuit, in order to establish a claim for equitable estoppel, "an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." 58 F.3d at 907. Mrs. Blum cannot show reasonable reliance. As stated above, the SRG Plan and the summary plan descriptions issued to Mr. Blum unambiguously requires Evidence of Good Health. The clear, unambiguous language of the SRG Plan Booklet and the Policy state that, in the absence of prior approval by Hartford, Mr. Blum only had supplemental life insurance up to the Guaranteed Issue Amount of $200,000. Given this unambiguous requirement, reliance on the documents implying the contrary was not, and could not be, reasonable or justifiable. *Cf. Kamler v. H/N Telecommunication Servs., Inc.*, 305 F.3d 672, 674 & 678–80 (7th Cir.2002) ("rejecting plaintiff's claim that he was entitled to medical benefits under employer's ERISA plan under estoppel theories where plaintiff relied on memos sent to him that read to say he was insured, and the employer claimed that plaintiff was not covered because he failed to complete the enrollment form required by the Plan because the PAL Plan documents unambiguously and clearly require enrollment as a precondition to coverage"); *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 907–08 (3d Cir.1995) (in suit challenging decision to terminate a post-retirement medical benefit plan, court found that even though "many retirees may have relied to their detriment on their interpretation of the summary plan description as promising vested or lifetime benefits," estoppel claim failed because an "unambiguous reservation of rights clauses in summary plan descriptions by which Unisys could terminate its retiree medical benefit plans" showed that plaintiffs could not "establish 'reasonable' detrimental reliance"); *Weir*, 123 F.3d at 290. Accordingly, summary judgment will be granted as to Mrs. Blum's equitable estoppel claim.

#### ii. Waiver

▮▮▮ Mrs. Blum claims that the Defendants have waived any right to deny that she is entitled to the plan benefits she claims. In support of her waiver claim, Mrs. Blum relies heavily on *Rhorer v. Raytheon Eng'rs & Constrs.*, 181 F.3d 634 (5th Cir.1999) and *Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351 (5th Cir.1991). Waiver is the "voluntary or intentional relinquishment of known right." *Rhorer,*

---

**12.** ERISA provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), and requires that the plan "provide a procedure for amend[ments] ... and for identifying the persons who have the authority to amend the plan." 29 U.S.C. § 1102(b)(3); *see also Degan,* 869 F.2d at 895 (ERISA requires all modifications to an employee benefit plan to be written and conform to formal amendment procedures); *Miller v. Coastal Corp.,* 978 F.2d 622, 623 (10th Cir. 1992) (same). Such a rule "protects the

plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan." *Rodrigue,* 948 F.2d at 971.

**13.** This assumption is based on the fact that the Fifth Circuit in *Weir* cited *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.,* a Third Circuit case, for the elements it would apply if it recognized an equitable estoppel claim.

181 F.3d at 645 (quoting *Pitts*, 931 F.2d at 357). Waiver is a distinct claim from equitable estoppel and a waiver claim does not require reliance. *Compare Pitts*, 931 F.2d at 357 (holding that waiver does not require reliance) *with Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 648 (7th Cir.1993) (discussing the point that the elements of waiver are not as well established as estoppel, and noting that some authority exists for the proposition that consideration or some level of detrimental reliance must be shown to prove waiver where estoppel elements are not also present) (citing 28 Am. Jur.2d Estoppel and Waiver § 30, § 159 (1966); 92 C.J.S. Waiver: Nature of Doctrine (1955)).

In *Rhorer*, a widow was denied optional life benefits under an ERISA-governed life insurance plan on the grounds that her deceased husband (who sold his company to Ratheon shortly before his death) never satisfied the plan's requirement that he be "actively at work." 181 F.3d at 637. The court found that the plan's "summary plan description [was] ambiguous as to whether the active work requirement applie[d] to option life insurance" and resolved the ambiguity in Ms. Rhorer's favor. *Id.* at 642. The court then held that Ms. Rhorer could pursue a waiver claim because Raytheon had (1) allowed Mr. Rhorer to enroll in the plan knowing that he has already stopped working, (2) accepted premiums for several months, and (3) failed to return those premiums for over a year. *Id.* at 645.[14]

In *Pitts v. American Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.1991), the Fifth Circuit found that the insurer had waived a condition of the policy upon which it attempted to rely in denying coverage. *Id.* The group policy at issue in that case required a minimum number of ten employees to enroll before coverage would be effective. However, the insurer in that case accepted premiums from the employer on the group policy for five months after knowing for all five months, "beyond all doubt," that the insured was the only person remaining on the policy. *Id.* Thus, it was absolutely clear that the number of enrollees to the policy fell well below the number required for quite some time.

Assuming one can bring a waiver claim under the circumstances of this case, the record is clear that Hartford did not know-

**14.** The Court notes that few courts have held that waiver is generally part of the common law of ERISA, but instead have performed case-specific waiver analyses. *See, e.g., Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375 (2d Cir.2002); *Juliano v. Health Maintenance Organization of New Jersey, Inc.*, 221 F.3d 279, (2d Cir.2000); *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1348 (11th Cir. 1994). Further, the majority of courts that have examined the issue have held or noted that waiver is unavailable when it would expand the scope of coverage under an ERISA plan. *Lauder*, 284 F.3d at 381; *cf. Juliano*, 221 F.3d at 288.

For example, In *Lauder*, the Second Circuit found waiver when the insurer failed to raise a lack of disability as a defense. *Id.* at 382. The court determined that "waiver here would not create coverage where none would otherwise exist; rather, [plaintiff's] disability is exactly the type contemplated by the policy." *Id.* at 382. In *Juliano*, the Second Circuit held that the defense of medical necessity had not been waived by the defendant because medical necessity was a required element for coverage and thus could not be waived. 221 F.3d 279. The court reasoned that "[e]ven when insurance coverage is denied, 'where the issue is the existence or nonexistence of coverage (*e.g.* the insuring clause and exclusions), the doctrine of waiver is simply inapplicable.'" *Id.*

In the instant case, Evidence of Good Health is required to be entitled to supplemental life insurance benefits over the Guaranteed Issue Amount of $200,000. Thus, it would seems that under the Second Circuit's approach, waiver would not be applicable because allowing Mrs. Blum to argue waiver would, in essence, expand the scope of coverage under the SRG Plan. However, as Mrs. Blum points out, the Fifth Circuit has never adopted this approach.

ingly and intentionally waive the Evidence of Good Health requirement. As previously stated, the SRG Plan and the Summary Plan Descriptions issued to Mr. Blum unambiguously requires Evidence of Good Health and there is no evidence that Mr. Blum submitted Evidence of Good Health. Thus, perhaps it could be said that the known right component of waiver is satisfied. However, one must still intentionally or voluntarily relinquish a known right. It is important to remember that on at least four occasions (three by letter and one via telephone) Mr. Blum was reminded to submit "Evidence of Good Health." Despite these repeated reminders, Mrs. Blum relies on the following evidence to support her waiver claim: (1) the "Benefits Enrollment Worksheet" that Mr. Blum received around June 1, 2001; (2) the premium for $1,000,000 in supplemental life insurance ($78.47) was deducted from the last paycheck Mr. Blum received before he died; and (3) a website print-out dated July 26, 2001 (six days after Mr. Blum died) entitled "Confirmation Statement" which stated "Supplemental Life Insurance—10 Times Annual Salary: Coverage Amount: $1,000,000."

The evidence reveals that all of these documents stem from a mistake or system error. In June of 2001, SRG held an open enrollment period for its benefit plans, and an on-line benefit plan enrollment system run by UltraLink was created. Apparently, there was an error in the set up of that system which created a number of problems. First, employees who had requested supplemental life insurance over the $200,000 guaranteed issue amount had their requested amount entered into the UltraLink system regardless of (1) whether medical certification has been obtained or (2) whether the amount requested was above the highest amount available under the terms of the SRG Plan effective in 2001. Thus, the UltraLink system did not distinguish between employees who elect-

ed more than the $200,000 guaranteed issue amount, but who had not completed the process of receiving approval from the insurer. Second, on June 28, 2001, UltraLink provided an electronic spreadsheet file showing the amount of deductions to make on employees' paychecks to pay for benefits requiring employee contributions. That file showed a deduction of $78.47 for supplemental life insurance for Mr. Blum. The amounts shown on the electronic file were input into the SRG payroll system, and those amounts were deducted from employees' paychecks. The first paychecks on which those amounts were deducted were distributed July 16, 2001. Mr. Blum had $78.47 deducted from his paycheck.

After the July 16, 2001, paychecks were distributed, SRG employees noticed that the amounts for certain benefit deductions were incorrect. SRG asked CBC to conduct an audit of the UltraLink file. On July 23, 2001, CBC sent an e-mail to SRG identifying erroneous payroll deductions for supplemental life insurance on over a dozen employees' paychecks, including Mr. Blum's. The over-deductions were refunded on these individuals' next paychecks, including Mr. Blum being credited $62.78 for the over-deduction. There is no evidence that the over-deduction was ever paid to Hartford. The fact that Mr. Blum died after the paycheck deduction occurred, but before the refund, makes the facts of this case highly unusual. However, the evidence shows that the paycheck deduction was a mistake and it was immediately corrected. The evidence also shows that Mr. Blum was reminded on at least four occasions that he needed to submit "Evidence of Good Health." Accordingly, the Court finds that the facts surrounding the paycheck deduction do not support the requisite intention on the part of Hartford to waive the requirement of "Evidence of Good Health."

Furthermore, the benefit enrollment worksheet merely confirms Mr. Blum's prior election of supplemental life insurance benefit of ten times his salary and also contained another admonition to Mr. Blum that he must submit "Evidence of Good Health." The benefit enrollment worksheet is a worksheet to assist Mr. Blum in requesting his benefits. The purpose of the worksheet is not to confirm the employee's entitlement to benefits. Nothing in this worksheet provides an entitlement to supplemental life insurance benefits and, thus, cannot be construed as a misrepresentation that Mr. Blum was covered for the supplemental life insurance. Accordingly, this document cannot support an implied waiver claim.

The web-site confirmation statement confirms Mr. Blum's benefit elections. It states: "Congratulations! Your elections are no complete.... When you exit this screen, your elections will be processed...." Under the heading "Your 2001 Benefit Elections," it shows Mr. Blum requested "supplemental life insurance— 10 time his salary: Coverage Amount: $1,000,000." The confirmation statement does not provide that Mr. Blum has been approved for the supplemental life insurance benefits. It is nothing more than a "confirmation of elections" and, thus, cannot support an implied waiver claim. Accordingly, the Court holds that no issue of material fact exists supporting Mrs. Blum's waiver claim in this case.

### CONCLUSION

For all the foregoing reasons, the Court concludes that Mrs. Blum has failed to raise a genuine issue of material fact for trial. Accordingly, the Court hereby **GRANTS** Defendants' Motions for Summary Judgment. Because Mrs. Blum's claims fail as a matter of law, the Court hereby **DISMISSES WITH PREJUDICE** Mrs. Blum's claims against Defendants in their entirety. Each party is to bear its own taxable costs and expenses incurred herein to date.

**IT IS SO ORDERED.**